971 F.2d 1148
 141 L.R.R.M. (BNA) 2035, 123 Lab.Cas. P 10,345
 RUM CREEK COAL SALES, INCORPORATED, Plaintiff-Appellant,
v.
W. Gaston CAPERTON; J.R. Buckalew; A.W. (Gene) Bumgardner;
Glen A. Ables; David L. Belcher; B.R. Chafin; P.D.
Clemons; W.E. McGraw, II; C.E. Akers, K.W. Cordial; W.R.
Gibson; C.P. Miller; J.B. Schoolcraft; B.A. Sloan; Gary
R. Tincher, and other officers of the West Virginia State
Police whose identity is presently unknown to Plaintiff;
West Virginia State Federation, AFL-CIO, Defendants-Appellees.
 Nos. 91-1882, 92-1145.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1992.
Decided Aug. 7, 1992.
 
 Paul Michael Thompson, Hunton & Williams, Richmond, Va., argued (James P. Naughton, Gregory B. Robertson, Todd A. Leeson, Richmond, Va., Forrest H. Roles, Donna M. Colberg, Mark A. Carter, Smith, Heenan & Althen, Charleston, W. Va., on brief), for plaintiff-appellant.
 Jan L. Fox, Deputy Atty. Gen., Office of Atty. Gen., Charleston, W. Va., argued (Mark A. Carter, Mario J. Palumbo, Atty. Gen., Bruce R. Walker, Office of Atty. Gen., Charleston, W. Va., Teresa Sage, Asst. Atty. Gen., Dept. of Public Safety, South Charleston, W. Va., Grant Crandall, William D. Turner, Crandall & Pyles, Thomas Patrick Maroney, Charleston, W. Va., on brief), for defendants-appellees.
 Before WIDENER, MURNAGHAN, and NIEMEYER, Circuit Judges.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 The present case originally arose as an appeal from the district court's denial of a preliminary injunction. Appellant Rum Creek Coal Sales, Inc. ("appellant" or "Rum Creek") sought relief against the West Virginia Department of Public Safety (the "Police") who appellant believed failed to protect its interests during a strike of its workers because of the Police's construction of two state statutes, a "Trespass" Statute and a "Neutrality" Statute.[1] On May 6, 1991, in Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353 (4th Cir.1991) ("Rum Creek I"), we reversed the denial of the preliminary injunction regarding the Trespass Statute, but left for later resolution by the district judge the consequences of the Neutrality Statute.
 
 
 2
 On May 3, 1991, the district court entered an order granting the appellant's motion for preliminary injunction as to the Trespass Statute. On July 15, 1991, the appellant filed a motion for summary judgment with the district court claiming that the two statutes in question were unconstitutional because they conflicted with federal law. West Virginia filed a response, the AFL-CIO filed a motion to intervene as a party, which was granted, and the district court entered an order on November 22, 1991, granting appellant summary judgment as to the Trespass Statute, and denying it as to the Neutrality Statute. The appellant's filing of a timely notice of appeal followed.
 
 
 3
 On December 5, 1991, the appellant filed a motion for attorney's fees and costs which was denied, "for this time," according to the published opinion, but not finally foreclosed. According to the district court, the appellant had not fully and specifically delineated the nature of the fees sought.
 
 
 4
 Two questions are presented by the appeal, first, whether the district court properly concluded that West Virginia's application of the Neutrality Statute was constitutionally valid, and second, whether the district court made a final determination ripe for appeal as to the appellant's entitlement vel non to, and the amount, if any, of attorney's fees and costs. We conclude that the district court erred as to its determination of the validity of West Virginia's interpretation of the Neutrality Statute. The interpretation and enforcement of the statute was invalid because of preemption by superior federal law. We also conclude that the district court made no final determination concerning appellant's request for attorney's fees, and we therefore remand to the district court for a final determination.
 
 I.
 
 5
 Two statutes created the controversy as it originally arose. First, the "Neutrality Statute" states that:
 
 
 6
 No officer or member of the department of public safety may, in any labor trouble or dispute between employer and employee, aid or assist either party thereto, but shall in such cases see that the statutes and laws of this State are enforced in a legal way and manner.
 
 
 7
 W.Va.Code § 15-2-13. Second, the "Trespass Statute" makes a trespasser criminally liable for knowingly entering property without permission and contrary to notice, defying an order to leave, causing damage while trespassing, or being armed with a weapon and intending to cause bodily harm while trespassing. W.Va.Code § 61-3B-3. The Trespass Statute, however, provides an exception indicating that its provisions do not apply "in a labor dispute." Id.
 
 
 8
 As we stated in Rum Creek I, there exists a long tradition of concern in West Virginia regarding the regulation of the sometimes violent interaction between State Police, employers, and their striking employees. In addition to the Trespass and Neutrality Statutes, the State has attempted to limit the invasive and harmful effect of Police intervention on the tenuous balance of power between management and labor.[2] Apparently, the promulgation of the Neutrality Statute was inspired by West Virginia's desire to defuse the likelihood that the Police would be used to assist employers in putting down strikes, and to limit the perception in the minds of its citizens that such a development was likely.
 
 
 9
 In accordance with these and other concerns, including the imminent threat of an actual strike, and in an attempt to provide specific procedures to comply with the law, the Police, and Governor Gaston Caperton, issued an interpreting memorandum on March 28, 1989, concerning the Neutrality and Trespass Statutes. The memorandum stated that:
 
 
 10
 As you are aware, West Virginia Code 15-2-13 [the Neutrality Clause], reads in part that "(n)o officer or member of the Department of Public Safety may, in any labor trouble or dispute between employer and employee, aid or assist either party thereto, but shall in such cases see that the statutes and laws of this State are enforced in a legal way and manner."
 
 
 11
 Troopers are simply proscribed from taking sides or doing anything not clearly in pursuit of legitimate law enforcement. For instance, Department members should clearly patrol areas of active labor unrest especially where illegal acts are reported or observed. Assaults, batteries and destruction of private or public property should be prevented and treated as any other crime. Public roads and waterways should be kept open to the flow of all traffic and the laws pertaining to "masked" demonstrators should be strictly enforced. However, labor demonstrators on private roads or land should not be bothered until appropriate warrants or court orders are obtained by the owners of said private roads or land....
 
 
 12
 (Emphasis in original).[3]
 
 
 13
 The specific circumstances surrounding the 1989 Rum Creek coal strike are cited in our original opinion. Rum Creek I, 926 F.2d at 356-57. At the present stage of the proceedings, it is relevant to reiterate that the workers at appellant's factory carried out a work stoppage which culminated in various injuries, significant damage to property, and disruption of appellant's business. During the disruptive and unlawful activity on the part of the strikers, which included the barricading of appellant's private bridge leading to its property, thereby preventing transportation of essential material, the Police apparently believed that the Trespass Statute and Neutrality Statute, in combination, prevented them from removing picketers who unlawfully blocked the private road.
 
 
 14
 The record illustrates exactly how the Neutrality Statute, in particular, and as distinguished from the Trespass Statute, affected the Police and limited their response to the strike situation. The Police admitted that the Neutrality Statute prevented officers from providing the most effective response to illegal activity by picketers. Colonel Jackie Buckalew, Superintendent of the West Virginia Police, testified that his officers, in response to the requirements of the Trespass and Neutrality Statutes, experienced frustration because "there are some things going on and they would like to take action on it, but they don't have the authority to take action...." In addition, Colonel Buckalew stated that the accepted interpretation of the Neutrality Statute prevented the Police from acting to prevent much of the illegal activity involved in the strike, and he responded in the affirmative to a characterization of the effect of the Statute, suggesting that it provided the picketers with a protective sanctuary within which to carry-on in a violently unlawful manner, at the expense of the rights of appellant.[4] Also, Buckalew testified that he was forced to station his troops in a non-optimal position in response to the Police interpretation of the Neutrality Statute's provisions.[5]
 
 
 15
 On November 29, 1989, appellant brought a suit for declaratory and injunctive relief under 28 U.S.C. § 2201 and 42 U.S.C. § 1983. It then filed a motion for a preliminary injunction to stop the Police from enforcing the statutes. Its motion was denied by the district court, and appellant's challenge was heard on appeal.
 
 
 16
 In Rum Creek I, we limited our review of the issues on appeal to the denial of the preliminary injunction on the enforcement of the Trespass Statute, and we reversed the denial as to that statute. We also limited our conclusion to the propriety of the preliminary injunction, and did not directly reach the merits of the case. In so finding, we concluded that a preliminary injunction was required under the four-part hardship balancing test that applies to the grant or denial of a preliminary injunction set forth in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir.1977) (the likelihood of irreparable harm to appellant if the injunction is not granted, the likelihood of harm to appellee if it is granted, the likelihood that appellant would succeed on the merits, and the concern for the public interest). Rum Creek I, 926 F.2d at 359-67.
 
 
 17
 Following our opinion in Rum Creek I, the appellant commenced the present round of litigation with its motion for summary judgment seeking a declaratory judgment regarding the constitutionality of both statutes at issue in the dispute, and an injunction against enforcement of the statutes. The district court, on November 22, 1991, ruled that the Trespass Statute was unconstitutional and enforcement of it was enjoined because of the court's conclusion that the National Labor Relations Act[6] effectively preempted the provision's authority, and because the Statute's limitations on arrests by Police, applying solely during labor disputes, violated appellant's equal protection rights. The issues concerning the propriety of the district court's conclusions as to the Trespass Statute are not before us, having not been appealed. The court, however, also concluded that the Neutrality Statute, as written, and if properly interpreted and applied, did not violate any constitutional provision. The court stated that the Neutrality Statute "does no more than codify recognized and dedicated public policy of a truly democratic society." The district court did not grant the appellant's subsequent motion for attorney's fees and costs, stating that, at the time of the motion, insufficient evidence was provided to justify the award. The court failed, however, to express a final resolution of the fee dispute, indicating that the denial was effective "for this time."
 
 II.
 
 18
 The West Virginia Neutrality Statute[7] serves substantially to affect the federally regulated management-labor relationship. The federal government has promulgated specific and involved rules for the control of that relationship. Perhaps the most comprehensive statute, the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("NLRA"), as altered by subsequent amendments, provides comprehensive mechanisms for the resolution of labor disputes, and also affirms Congressional recognition of the broad rights of adversaries in such disputes. To the extent that West Virginia's statutory provisions violate, are inconsistent with, or substantially undermine federal rules for the protection of the rights of citizens in a labor dispute, the Supremacy Clause of the Constitution mandates that the state provision must be preempted.[8] With respect to preemption in general, we have held that:Preemption occurs in any of three manners: (1) Congress may pass a statute that by its express terms preempts state law, (2) Congress, though not expressly so stating, may imply that it is preempting state law by occupation of an entire field of regulation, so that no room is left for supplementary state regulation, (3) Congress may speak neither expressly nor impliedly of preemption, nonetheless state law is preempted to the extent it actually conflicts with federal law; such a conflict occurs when (a) compliance with both state and federal law is impossible or (b) when state law stands as an impediment to a federal purpose.
 
 
 19
 Abbot v. American Cyanamid Co., 844 F.2d 1108, 1111 (4th Cir.1988) (emphasis added) (citing Michigan Canners & Freezers Assoc. v. Agricultural Marketing & Bargaining Building, 467 U.S. 461, 469, 104 S.Ct. 2518, 2522, 81 L.Ed.2d 399 (1984)).
 
 
 20
 We conclude that, in the present case, the interpretation and application of the Neutrality Statute violated federal protections governing labor relations by creating an impediment to the clear federal purpose of the protection of the free expression of peaceful economic forces in a strike situation. Therefore, we find that the Statute is effectively preempted by the supreme federal labor law, and is, therefore, invalid.
 
 
 21
 The preemption doctrine has been frequently applied to state regulation of labor relations. Of course, not all state regulation of labor relations is preempted by the current provisions of the NLRA. Among the types of state action that are preempted, however, is regulation that restricts "the free play of economic forces." Lodge 76, Int'l Assoc. of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976) ("Machinists"). The Machinists Court expressed the broad basis of federal labor protections, indicating that:
 
 
 22
 The Court had earlier recognized in pre-emption cases that Congress meant to leave some activities unregulated and to be controlled by the free play of economic forces.... For a state to impinge upon the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.
 
 
 23
 Id. at 144, 96 S.Ct. at 2555 (citations omitted). Additionally, the Court specifically stated that such protection of the "free play of economic forces" was not applied solely to employees in a labor dispute:
 
 
 24
 Although many of our past decisions concerning conduct left by Congress to the free play of economic forces address the question in the context of union and employee activities, self-help is of course also the prerogative of the employer because he, too, may properly employ economic weapons Congress meant to be unregulable.... Resort to economic weapons should more peaceful measures not prevail is the right of the employer as well as the employee ... and the State may not prohibit the use of such weapons....
 
 
 25
 Id. at 147, 96 S.Ct. at 2556 (emphasis added) (citations omitted). Recently, in Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Court reaffirmed the preemption doctrine set out in Machinists, stating that "[t]he Machinists rule creates a free zone from which all regulation, whether federal or state, is excluded." Golden State, 493 U.S. at 111, 110 S.Ct. at 451.
 
 
 26
 In Rum Creek I, we characterized the Machinists holding as recognizing the rights of labor adversaries to be protected against state interference by "being free from government regulation of the peaceful methods of putting economic pressure upon one another." Rum Creek I, 926 F.2d at 364. We went on to note that "[p]ermissible economic tactics that employers and employees have a right to use without state infringement include striking and withstanding strikes." Id. However, we expressly observed that the Machinists doctrine allows state governments to restrict labor activity that involves "obstructing or attempting to obstruct free ingress or egress to and from the property." Rum Creek I, 926 F.2d at 365 (quoting Machinists, 27 U.S. at 137 n. 2, 96 S.Ct. at 2552 n. 2).
 
 
 27
 The enforcement policy for the Neutrality Statute involved in the present case served to restrict the rights of the appellant to apply economic pressure and to withstand a strike. By failing to act to preserve a basically orderly condition on the appellant's private property, the State admittedly allowed for a private sanctuary for the strikers on that property. Such an allowance provided the strikers with extended and unjustified economic power at the expense of the appellant. One of the tools available to the appellant in withstanding a strike against it, the protection of free flow of material and personnel into its plant, was taken away by the state's "neutral" policy of allowing the strikers to construct and protect a bunker which prevented ingress and egress into the property. A state regulation that sought to insure true neutrality to labor disputes, one which prevented the substantial isolation of the plant in question from the outside world and which allowed both parties the reasonable protections of the police force, would not violate the broad protections of both management and labor set out in the Machinists doctrine. With a different interpretation, the Neutrality Statute likely could have withstood an attack on preemption grounds. A more preferable application of a doctrine of neutrality would mandate neutral enforcement of the laws of the state, not neutral acquiescence to unlawful acts of destruction, and would promote, or at least not effectively undermine, the federal purpose of free interplay of economic forces. Without neutral enforcement of the law, the criminal acts of one or another party in a labor dispute can effectively hold that federal purpose hostage, as the acts of the strikers did here.
 
 
 28
 In the present case, the state inaction, determined by its interpretation of the Neutrality Statute, constituted a violation of the appellant's federally protected rights to withstand a strike. The failure to do anything to come between the strikers and management condoned violence and served to provide unjustified support to the strikers by restricting the pressure which the appellant could lawfully bring to bear in support of its own anti-strike efforts.[9] The equal playing field of labor dispute must effectively include the reasonable protection of law and order by a disinterested and neutral referee. Without that neutral enforcement agent, and without the prevention of wholesale unlawful and violent activity, the free zone of economic forces required by federal law is an impossibility.
 
 
 29
 Accordingly, to the extent that the Neutrality Statute, as actually interpreted, prevented the State Police from doing anything significant in the way of enforcing the law, particularly aspects of the law involving appellant's use of its own property, essential to the free expression of a business owner's rights to stay in business and withstand a strike, we find that the statute is preempted by protections established in federal law and further expressed in the Machinists and Golden State opinions.[10] Therefore, we conclude that the West Virginia Neutrality Statute, as it has been interpreted and applied, is constitutionally invalid as a violation of federal regulations enforceable through the Supremacy Clause. To the extent that the district court concluded otherwise, we reverse its decision.
 
 III.
 
 30
 Additionally, we are obliged to resolve the dispute over appellant's requested attorney's fees. The appellee is correct in arguing that the order denying attorney's fees and costs to the appellant is a non-final order, preventing, as premature, appellate jurisdiction under 28 U.S.C. § 1291. The district court attempted to reserve final resolution of the award of attorney's fees until more information was provided by appellant, and until resolution of several other issues properly raised by the present appeal. Although styled in the form of a final order, the district court's January 23, 1992, order appears to equivocate as to whether it constituted a final determination of appellant's right to fees:
 
 
 31
 After careful consideration of the issues raised herein, the court is of the opinion that the petition for fees should be denied at this time in that it fails to delineate with the required specificity and clarity the items and claims for which compensation in the nature of attorney's fees is sought ... Furthermore, the issues raised in the case have not, at this stage of the proceedings, been fully resolved. The determination of the trial court of the two issues raised by plaintiff herein are both at this time pending on appeal to the Fourth Circuit ...
 
 
 32
 (Emphasis added).
 
 
 33
 The appellant points to authority suggesting that the district court should act promptly in granting or denying fees, and that it should not wait for the resolution of issues on appeal to make its grant. Mother Goose Nursery Schools, Inc. v. Sendak, 770 F.2d 668, 675 (7th Cir.1985), cert. denied, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). However, it is apparent that the order denying attorney's fees "at this time" is not final. Any analysis of the propriety of attorney's fees on our part absent a final determination by the district court would be inappropriate. We are obliged, therefore, to remand the case for a final and expeditious determination of the attorney's fees dispute.
 
 The case is
 
 34
 REVERSED AND REMANDED.
 
 
 
 [1]
 See W.Va.Code §§ 15-2-13 (Neutrality statute); 61-3B-3 (Trespass Statute)
 
 
 [2]
 In Rum Creek I, we cited various statutes which limited the role of West Virginia County Police in labor disputes. Rum Creek I, 926 F.2d at 355
 
 
 [3]
 Appellant, at oral argument, indicated that the provision allowing for arrest following issuance of a warrant was insufficient for the incident at issue, and for all similar occurrences, given the lack of any particularized knowledge of the specific individuals responsible for violent acts during particularly violent incidents of labor unrest
 
 
 [4]
 In a deposition, appellant specifically questioned Colonel Buckalew on the effect of the Neutrality Statute, as interpreted, on the law enforcement activity in connection with the Rum Creek strike:
 [Appellant] One of the criticisms that the marshals, and I guess others who don't understand your position, were making of your department was the vehicles, the law enforcement vehicles, and the officers were being situated too far away from where the action was. Is that an accurate statement?
 [Colonel Buckalew] I think so, yes. But, you know, there was a reason for that.
 [Appellant] I realize the reason was the Neutrality--
 [Colonel Buckalew] On public property as opposed to private property.
 [Appellant] As I understand it, and please correct me if I'm wrong, is that because of the Neutrality Statute you believe that the enforcement policy is that the vehicles will be situated on public property?
 [Colonel Buckalew] Yes, that's correct.
 [Appellant] This was so even though you knew that most of the crimes were being committed on private property?
 [Colonel Buckalew] Yes. I think probably I would like to--I think I said this in court, but I would like to repeat this again. I don't think under my leadership, I'm not going to take the organization outside the law to try to enforce the law the way someone else thinks it should be. Basically that's my philosophy on that.
 [Appellant] I understand that, sir, and quite frankly--
 [Colonel Buckalew] It doesn't make any difference whether I agree with it or not. That's totally immaterial.
 [Appellant] That's really our whole purpose in this lawsuit is to try to get the courts to construe these laws in what we think is a constitutional way, and maybe they will be changed.
 As a result of the policy where you cannot come on private property, would you agree with me that that really gives pickets sort of a sanctuary?
 [Colonel Buckalew] Oh, yes, yes, it certainly does and they take advantage of it. They take advantage of that. They are out there beforehand. They know what the state right-of-way is. They're out there with their tapes, and they measure where that is, and they set up themselves accordingly. That happens all the time.
 [Appellant] It makes their picketing much more intimidating. Would you agree with that, too?
 [Colonel Buckalew] Well, the fact that they're--I guess if they get there in time, they get the choice seat, you know, and so I suppose you could say that. I don't mean to be humorous about this.
 [Appellant] I understand that.
 
 
 [5]
 Appellee state government did not contend at trial, and does not argue on appeal, that the Police interpretation of the Neutrality Statute's provisions as expressed in the record, is unauthorized. Additionally, it is clearly appropriate to allow the police department, and its Superintendent, to provide authorized interpretations of statute provisions that control the activity of the Police. The only effective and relevant meaning of the Neutrality Statute is that which is implemented by the authorized officials, as in the present case, the State's Governor and Police Superintendent. See Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972) (deference is owed to the interpretation of a statutory provision "given by those charged with enforcing it")
 
 
 [6]
 29 U.S.C. § 151 et seq
 
 
 [7]
 W.Va.Code § 15-2-13
 
 
 [8]
 The Supremacy Clause set out in Article VI of the federal Constitution states that: "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land ... anything in the constitution or laws of any state to the contrary notwithstanding."
 
 
 [9]
 The State's failure to prevent unlawful and violent attacks on union organizers or sympathizers in the factory complex or elsewhere, by management, based on the interpretation by the Police of the requirements of "neutrality" to any labor dispute, likely would be similarly invalid as a failure to protect a free zone of economic activity mandated by federal law
 
 
 [10]
 The State and appellee-intervenor union have contended that appellant sought too much in the way of state protection when it demanded armed guards and escorts for vehicles entering its plant. Certainly, such a bold and obvious presence in support of the appellant could be viewed as casting the scales of neutrality to come down on the side of management. But to the extent that the Neutrality Statute, as it did here, has prevented the State Police from carrying out even the most basic law enforcement activities, including the insuring of peaceful ingress and egress on the appellant's private roads, the statute, as interpreted, clearly violated the appellant's rights. Unreasonable and disruptive requests by the appellant of the police that go beyond the demand for such basic law enforcement activity are not likely to be granted, and should not be thought to be authorized herein