31 F.3d 169
 146 L.R.R.M. (BNA) 2923, 63 USLW 2082
 RUM CREEK COAL SALES, INCORPORATED, Plaintiff-Appellant,
v.
Honorable W. Gaston CAPERTON; Colonel J.R. Buckalew;
Captain A.W. (Gene) Bumgardner; Sergeant Glen A. Ables;
Sergeant David L. Belcher; Sergeant B.R. Chafin; Sergeant
P.D. Clemons; Corporal W.E. McGraw, II; Trooper C.E.
Akers; Trooper K.W. Cordial; Trooper W.R. Gibson; Trooper
C.P. Miller; Trooper J.B. Schoolcraft; Trooper B.A.
Sloan; Trooper Gary R. Tincher, and other officers of the
West Virginia State Police whose identity is presently
unknown to Plaintiff, Defendants-Appellees,
and
West Virginia State Federation, AFL-CIO, Defendant.
 No. 93-1540.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 10, 1993.
Decided July 25, 1994.
 
 ARGUED: Paul Michael Thompson, Hunton & Williams, Richmond, VA, for appellant. Jan L. Fox, Sp. Asst. Atty. Gen., Steptoe & Johnson, Charleston, WV, for appellees. ON BRIEF: James P. Naughton, Bruin S. Richardson, III, Hunton & Williams, Richmond, VA; Forrest H. Roles, Donna C. Kelly, Smith, Heenan & Althen, Charleston, WV, for appellant. Teresa L. Sage, Asst. Atty. Gen., South Charleston, WV, for appellees.
 Before WIDENER, MURNAGHAN, and NIEMEYER, Circuit Judges.
 Affirmed in part, reversed in part, and remanded by published opinion. Judge NIEMEYER wrote the opinion for the court, in which Judge WIDENER and Judge MURNAGHAN concurred in part. Judge WIDENER wrote a concurring opinion and Judge MURNAGHAN wrote an opinion concurring in part and dissenting in part.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 This case, now here for the third time, presents issues relating to the proper allowance of attorneys fees to be awarded under 42 U.S.C. Sec. 1988. As the prevailing party under 42 U.S.C. Sec. 1983, Rum Creek Coal Sales, Inc., petitioned the district court for an award of $802,389 for fees and expenses incurred by its attorneys through January 1993. The district court awarded $406,857. Contending that the district court's reduction was the product of legal error and constituted an abuse of discretion, Rum Creek Coal seeks an award of the full amount requested in its petition, together with (1) $72,373 for the post-petition period between January 1993 and May 31, 1993, before this appeal; (2) $20,000 for this appeal; and (3) a 5% overall enhancement for extraordinary success, for a total award of $939,501. To avoid further litigation, a possible fourth appeal, and attendant expenses, it requests that we determine the amount of the award, rather than remanding the case on the issue of attorney's fees.
 
 
 2
 On review of the district court's award, we affirm in part and reverse in part, allowing Rum Creek Coal $709,234.31 for fees and expenses through January 1993. To cover the fees and expenses incurred after that date, on which we have inadequate data on which to make an award, we remand the case to the district court for entry of an additional award.
 
 
 3
 * This litigation arose from a coal strike in 1989 by the United Mine Workers of America against Rum Creek Coal Sales, Inc. and other companies. Picketing strikers formed picket lines and barricades across Rum Creek Coal's private access roads with fallen trees, logs, and scrap appliances, and they threw rocks and other projectiles at Rum Creek's trucks in an effort to close down the coal mines. During the course of the strike, trucks were damaged and disabled and people were injured. The district court, when considering a preliminary injunction, characterized the conduct as "savagery" and called it "uncivilized." The company contended that millions of dollars' worth of damages were caused.
 
 
 4
 Rum Creek Coal's efforts to enlist the police to establish order met with little success. While the police would maintain patrols on public property at some distance from the violent barricades, they refused to enforce trespass laws on company property during a labor dispute. The policy of the West Virginia Department of Public Safety, based on West Virginia statutes, was that arrests may be made on private property for all criminal acts except trespass during a labor dispute. The Department deliberately refrained from "interfering in matters involving labor demonstrations or trespass on private roads or lands in connection therewith." As a consequence, the police were ineffective in preventing the violence.
 
 
 5
 Two West Virginia statutes underlying the policy of the Department of Public Safety required police to remain neutral during labor disputes and limited the enforcement of trespass laws. The "Neutrality Statute" provided that no police officer may "aid or assist either party" to a labor dispute, W. Va.Code Sec. 15-2-13, and the "Trespass Statute Proviso" stated that statutory trespass provisions "shall not apply in a labor dispute," W. Va.Code Sec. 61-3B-3.
 
 
 6
 Rum Creek Coal filed this action under 42 U.S.C. Sec. 1983 in November 1989, contending that these state statutes interfered with federal labor policy by changing the balance between employer and employee established by the National Labor Relations Act ("NLRA"). It contended that West Virginia's policy was preempted by the national labor policy and that the state statutes denied Rum Creek Coal rights guaranteed by the Equal Protection Clause and the Due Process Clause of the United States Constitution. Rum Creek Coal sought a declaratory judgment that the statutes were unconstitutional, and preliminary and permanent injunctions prohibiting enforcement of the statutes.
 
 
 7
 Following a four-day hearing in January 1990 on the motion for a preliminary injunction to bar enforcement of the Trespass Statute Proviso, the district court refused to order the preliminary injunction. On appeal, we reversed, concluding that the state's policy of withdrawing the general protection of the trespass statutes during a labor dispute conflicted with and was preempted by the NLRA. See Rum Creek Coal Sales, Inc. v. Caperton ("Rum Creek Coal I"), 926 F.2d 353 (4th Cir.1991). The Neutrality Statute was not addressed at that time.
 
 
 8
 On remand, Rum Creek Coal filed a motion for summary judgment on the merits of its claims, seeking a declaratory judgment that both the Trespass Statute Proviso and the Neutrality Statute were unconstitutional and a permanent injunction prohibiting their enforcement. At the same time, the district court granted the motion of the AFL-CIO to intervene and participate on behalf of the West Virginia defendants. Following discovery and briefing by all parties, the district court granted Rum Creek Coal's motion to declare the Trespass Statute Proviso unconstitutional, but it denied the motion with respect to the Neutrality Statute. On appeal, we again reversed, concluding that the Neutrality Statute likewise violated the federal policy governing labor relations and was therefore preempted. Rum Creek Coal Sales, Inc. v. Caperton ("Rum Creek Coal II"), 971 F.2d 1148 (4th Cir.1992).
 
 
 9
 Thereafter, Rum Creek Coal Company filed a petition for attorney's fees and costs incurred through January 1993 in the amount of $802,388.85, which it had paid to its two law firms, Hunton & Williams of Richmond, Virginia, and Smith, Heenan & Althen of Charleston, West Virginia. The matter was referred to a magistrate judge who disallowed $221,161 and approved the figure of $581,228, leaving open for the district court the possibility of a further across-the-board reduction. In making the reductions, the magistrate judge disallowed $11,008.75 in fees and expenses relating to media communications and public relations regarding the case; $1,203.75 in fees and expenses relating to an unsuccessful amicus brief; $33,839.54 in fees and expenses relating to an unsuccessful opposition to the AFL-CIO's motion to intervene; and $2,831.50 requested by Smith, Heenan & Althen for "general assistants." In addition to these specific reductions, the magistrate judge reduced the hourly rates charged by both law firms because he found them to be excessive. He relied on his own knowledge of the prevailing community rates in Charleston and on the attorneys' failure, when billing, to distinguish between in-court and out-of-court time. The magistrate judge acknowledged that the fee petition he was considering was one that had been recently revised by Rum Creek Coal to remove duplicate billings of about $8,800 which had been objected to by the defendants. Accordingly, he concluded that for those duplications "no reduction is necessary." Finally, the magistrate judge left for the district court a ruling on defendant's motion for an additional 20-30% reduction for "the excessive nature and unreasonable redundancy of plaintiff's billing procedures."
 
 
 10
 The district court conducted a de novo review of the magistrate judge's recommendations and adopted them in toto. Addressing the defendants' request that the fees requested should be reduced further by 20-30%, the district court stated that it was "of the opinion that because of the excessive nature and unreasonable redundancy of Plaintiff's work, this Court should make a thirty percent (30%) reduction on the fee application submitted." The court thus reduced Rum Creek Coal's fee request by another $174,370, allowing a total of $406,857 on Rum Creek Coal's petition for fees and expenses.
 
 
 11
 No further petition was submitted to the district court for fees and expenses incurred after January 1993, but in its brief for this appeal Rum Creek Coal states that it has incurred additional fees and expenses during the period from January 1993 through May 31, 1993, in the amount of $72,373.56. It also requests "approximately $20,000" for this appeal and an overall enhancement of 5% based on success. The total amount requested by Rum Creek Coal for fees and expenses is thus $939,500.53.
 
 
 12
 Rum Creek Coal urges what it acknowledges is unusual relief in requesting that we calculate the final award for attorney's fees and expenses because any remand order would only prolong the litigation and increase the attorney's fees. It contends that twice it has requested the district court to award fees in accordance with the criteria imposed by the Fourth Circuit and twice the district court has refused to do so. It suggests the possibility therefore of yet a fourth appeal if the case is remanded.
 
 II
 
 13
 The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. Sec. 1988, provides that in federal civil rights actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." Although the text of the provision does not guide the district court's discretion in whether to allow fees, the Supreme Court, relying on the purposes of the civil rights laws and equitable considerations, has concluded that a plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." See Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (quoting S.Rep. No. 94-1011, 94th Cong., 2d Sess. 4 (1976) U.S.Code Cong. & Admin.News pp. 5908, 5912 (internal citation omitted)).
 
 
 14
 While our review of a district court's decision in awarding fees is for an abuse of discretion, see Hensley, 461 U.S. at 437, 103 S.Ct. at 1941, the deferential review ordinarily inherent in that standard is modified by a closer review when the appropriate criteria that are established for a fee award are in question. See Cooper v. Dyke, 814 F.2d 941, 950 (4th Cir.1987) (abuse of discretion review appropriate if district court follows proper standards); Daly v. Hill, 790 F.2d 1071, 1085 (4th Cir.1986) (abuse of discretion not applicable where district court applies incorrect criteria).
 
 
 15
 The starting point for establishing the proper amount of an award is the number of hours reasonably expended, multiplied by a reasonable hourly rate. Hensley, 461 U.S. at 433, 103 S.Ct. at 1939; Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). When plaintiff prevails on only some of the claims made, the number of hours may be adjusted downward; but where full relief is obtained, the plaintiff's attorney should receive "a fully compensatory fee," and in cases of exceptional success, even an enhancement. 461 U.S. at 435, 103 S.Ct. at 1940. The number of hours must obviously be adjusted to delete duplicative or unrelated hours. At bottom, the number of hours must be reasonable and must represent the product of "billing judgment." 461 U.S. at 437, 103 S.Ct. at 1941.
 
 
 16
 In determining the reasonableness of the number of hours, the Supreme Court endorses the use of the factors established in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974), and recognized by this court in Daly, 790 F.2d at 1077. See Blum, 465 U.S. at 893, 104 S.Ct. at 1546. The twelve Johnson factors, which were considered favorably by Congress in enacting the Act, are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. See 488 F.2d at 717-719; Hensley, 461 U.S. at 430 n. 3, 103 S.Ct. at 1938 n. 3.
 
 
 17
 The hourly rate included in an attorney's fee must also be reasonable. Hensley, 461 U.S. at 433, 103 S.Ct. at 1939. This requirement is met by compensating attorneys at the "prevailing market rates in the relevant community." See Blum, 465 U.S. at 895, 104 S.Ct. at 1547. This determination is fact-intensive and is best guided by what attorneys earn from paying clients for similar services in similar circumstances. Id. at 895 n. 11, 104 S.Ct. at 1547 n. 11. While evidence of fees paid to attorneys of comparable skill in similar circumstances is relevant, so too is the rate actually charged by the petitioning attorneys when it is shown that they have collected those rates in the past from the client. See Gusman v. Unisys Corp., 986 F.2d 1146 (7th Cir.1993) (recognizing that attorney's actual billing rate provides a "starting point" for purposes of establishing a prevailing market rate).
 
 
 18
 The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits. See National Wildlife Federation v. Hanson, 859 F.2d 313 (4th Cir.1988). In circumstances where it is reasonable to retain attorneys from other communities, however, the rates in those communities may also be considered. Id. at 317.
 
 
 19
 Thus, a fully compensatory fee will include compensation for all hours reasonably expended at market rates in the relevant community, and market rates may be proved by the rate which clients normally and willingly pay the petitioning attorneys.
 
 
 20
 With these principles at hand, we will now address the specific points raised by Rum Creek Coal Company in this appeal.
 
 III
 
 21
 The parties agree that Rum Creek Coal Company is the "prevailing party" as the term is used in 42 U.S.C. Sec. 1988. Indeed, it prevailed on every claim that it asserted. In Count I of its complaint, Rum Creek Coal sought a declaratory judgment that West Virginia Code Sec. 15-2-13 (Neutrality Statute) and Sec. 61-3B-3(d) (the Trespass Statute Proviso) were unconstitutional, and in Count II it requested an injunction barring the statutes' enforcement. Rum Creek Coal thus assumed the role of private attorney general to vindicate not only its own civil rights but those of all other persons in West Virginia involved in labor disputes to assure that law enforcement remains unaffected by the existence of a labor dispute. See Texas State Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989). Having fully prevailed, Rum Creek Coal should therefore be "fully compensated" for its legal expenses. See Hensley, 461 U.S. at 435, 103 S.Ct. at 1940.
 
 
 22
 Given its complete success, Rum Creek Coal contends that it is entitled, at least, to full compensation for the fees it actually paid to its attorneys. It maintains that the district court, in reducing the fee requested in its fee petition by about one half, erred as a matter of law and abused its discretion. We will examine in order the various bases for the district court's reduction of fees requested.
 
 Media and Public Relations Expenses
 
 23
 Rum Creek Coal challenges the disallowance of $11,008.75 in fees for public relations efforts. In support of this claim, it directs us to Davis v. San Francisco, 976 F.2d 1536 (9th Cir.1992), reh'g denied, vacated in part, and remanded, 984 F.2d 345 (9th Cir.1993), where the court accepted the possibility of awarding fees for public relations efforts where the time so spent contributed, "directly and substantially, to the attainment of [the plaintiffs'] litigation goals." Id. at 1545. The Davis court was willing to consider an award of fees for public relations efforts because the issue in litigation, employment discrimination in the fire department, lent itself to resolution in the political arena. Rum Creek Coal argues that the circumstances here are similar to those in Davis because here, press coverage of the dispute was particularly hostile to Rum Creek Coal. It maintains that it "responded [through the media] in order to sway public opinion and influence State policy-makers to change the State Police's enforcement policies." It thus urges that we follow the lead of the Ninth Circuit in Davis.
 
 
 24
 The defendants oppose funding public relations expenses, drawing our attention to a long string of cases in which various courts have, without substantial comment, excluded fees for public relations efforts. See, e.g., Greater Los Angeles Council on Deafness v. Community Television of Southern California, 813 F.2d 217, 221 (9th Cir.1987) (affirming denial of fees for time spent on publicity and lobbying); Hart v. Bourque, 798 F.2d 519, 523 (1st Cir.1986) (affirming denial of fees for time "spent on arrangements for lectures or publications about the case").
 
 
 25
 While the district court gave no explanation for its decision not to award fees and expenses incurred in connection with public relations efforts, we nevertheless agree with its decision in the circumstances of this case. The legitimate goals of litigation are almost always attained in the courtroom, not in the media. Even if we were to adopt the holding in Davis, which we do not do, the press efforts in this case were aimed, not at achieving litigation goals, but at minimizing the inevitable public relations damage to the company for suing the governor and the state police to alter the pro-labor police enforcement policies. Accordingly, we affirm the district court's disallowance of $11,008.75 for attorney's fees and expenses claimed in connection with public relations efforts.
 
 Expenses in Opposing AFL-CIO Intervention
 
 26
 Rum Creek Coal next contends that the district court erred in excluding attorney's fees and expenses, totaling $33,839.54, incurred in opposing the AFL-CIO's intervention. The amount disallowed represents $32,447 for 184.5 hours and $1,392.04 in expenses. No reason was given either by the magistrate judge or the district judge for the disallowance except to say that Rum Creek Coal was the losing party on the motion to intervene. The state defendants, however, do not rely on that ground. Instead, they contend that the Supreme Court's decision in Independent Federation of Flight Attendants v. Zipes, 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989), requires the disallowance. In Zipes, the Court held that a prevailing plaintiff in a civil rights case can recover from an intervening party only when the intervening party's action is "frivolous, unreasonable or without foundation." Id. at 761, 109 S.Ct. at 2737. The Court reasoned that to shift fees to an intervenor, who has not violated anyone's civil rights, would not advance the national policy of vindicating wrongful discrimination.
 
 
 27
 Arguing to distinguish Zipes, Rum Creek Coal notes that the question there was whether the plaintiff could recover attorney's fees from an intervenor, and not whether it could include intervention-related attorney's fees in its petition against a losing defendant. Rum Creek Coal seeks to derive comfort from Justice Blackmun's concurring opinion where he stated, "I see nothing in the language of the statute or in our precedents to foreclose a prevailing plaintiff from turning to the Title VII defendant for reimbursement of all the costs of obtaining a remedy, including the costs of assuring that the third-party interests are dealt with fairly." 491 U.S. at 767, 109 S.Ct. at 2740 (Blackmun, J., concurring). Rum Creek Coal also relies on Jenkins v. Missouri, 967 F.2d 1248, 1251 (8th Cir.1992) (holding that the State of Missouri, which was the constitutional violator, should pay the expenses incurred in connection with intervenors because of the "special nature of desegregation cases" in which "withholding from the plaintiffs the means for paying their attorneys could be devastating to the national policy of enforcing the civil rights laws").
 
 
 28
 Although the Supreme Court in Zipes may have left room to argue that intervention-related fees may be shifted under a fee-shifting statute to the defendants, because the only issue there related to an intervenor's fee liability, we nevertheless conclude that Zipes instructs us not to shift intervention-related expenses to the losing defendant. The Zipes Court repeatedly implied that in cases where there are intervention-related expenses, the prevailing party may be required to bear them. For example, it observed that Congress did not, with respect to intervention-related fees, wish to give the plaintiff an advantage, presumably by shifting that type of expense from the plaintiff. 491 U.S. at 764, 109 S.Ct. at 2738. In addition, the Court concluded that union intervention for the protection of union members, while not a disfavored activity in civil rights cases, nevertheless is not the type of conduct that fee-shifting statutes were intended to encourage. Id. at 765, 109 S.Ct. at 2738-39. The Court stated that a rule which left such intervention-related fees to be borne by the plaintiff under the standard American rule would not destroy the incentive to bring civil rights claims because where there is a prevailing plaintiff, there is always a losing defendant who will be responsible for at least those fees and expenses incurred in the litigation between the plaintiff and the defendant. The Court explicitly stated:
 
 
 29
 Assessing fees against blameless intervenors, however, is not essential to that purpose [of vindicating the national policy against wrongful discrimination]. In every lawsuit in which there is a prevailing Title VII plaintiff there will also be a losing defendant who has committed a legal wrong. That defendant will, under Newman [v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263], be liable for all of the fees expended by the plaintiff in litigating the claim against him, and that liability alone creates a substantial added incentive for victims of Title VII violations to sue.
 
 
 30
 Id. at 761, 109 S.Ct. at 2736-37 (emphasis added). That this statement by the Court is to be read to leave the burden of intervention-related fees and expenses with the plaintiff, in accordance with the general American rule, is confirmed by the statements in separate opinions of Justice Blackmun and Justice Marshall. Justice Blackmun, criticizing the majority's recognition of a rule that would leave intervention-related fees with the plaintiff, said:
 
 
 31
 It seems to me that the first step toward solving the problem of intervenor fee liability is to recognize that it is the Title VII wrongdoer, and not the Title VII plaintiff, whose conduct has made it necessary to unsettle the expectations of a third party who itself is not responsible for the Title VII plaintiff's injuries. The Court states that the "defendant will, under Newman, be liable for all of the fees expended by the plaintiff in litigating the claim against him," ante, 491 U.S. at 761, 109 S.Ct. at 2737 (emphasis added)--and thereby tacitly assumes that the defendant's fee liability goes no further. I see no basis for that assumption.
 
 
 32
 Id. at 767, 109 S.Ct. at 2739-40 (Blackmun, J., concurring). Justice Marshall, also criticizing the majority's assignment of intervention-related fees to the plaintiff, said:
 
 
 33
 The majority further states that a defendant's liability for "all of the fees expended by the plaintiff in litigating the claim against him, ... alone creates a substantial added incentive for victims of Title VII violations to sue." Ante, at 761, 109 S.Ct. at 2737 (emphasis added). The majority apparently believes that the typical victim injured by discrimination will have available discretionary income, possibly running into the hundreds of thousands of dollars, to spend to counter intervenors' claims.
 
 
 34
 Id. at 775, 109 S.Ct. at 2744 (Marshall, J., dissenting). That the majority retained the "against him" language in the face of these attacks surely implies that intervention-related fees ought normally to be borne by a plaintiff.
 
 
 35
 Under the Supreme Court decision in Zipes, we are required to hold that the intervention-related fees and expenses in question here are not recoverable under 42 U.S.C. Sec. 1988 by a prevailing plaintiff against a losing defendant. Accordingly, we affirm the district court's exclusion of those amounts.
 
 Other Miscellaneous Reductions
 
 36
 The district court disallowed Rum Creek Coal's request for fees and expenses in connection with various items of work that the court concluded were unnecessary for the prosecution of the litigation. It disallowed $1,203.75 in fees for work done on an amicus brief for clients who were not prevailing parties in this litigation. It disallowed $11,776 incurred for work done on matters unrelated to this litigation. And it disallowed $2,831.50 for "general assistants" which the magistrate judge found to be "without basis." Our review of these matters discloses that the district court acted well within its discretion in disallowing these items, and we therefore affirm the rulings.
 
 Adjustments to Hourly Rates
 
 37
 The most significant reduction recommended by the magistrate judge and approved by the district court is the finding that the hourly rates of the billing attorneys was excessive for the Charleston, West Virginia, community. Based on this finding, the district court disallowed approximately $187,000 in Hunton & Williams' fees, reducing its billing rates from the range of $115 to $230 per hour to a range of $80 to $160 per hour, and approximately $32,500 in Smith, Heenan & Althen's fees, reducing its billing rates from the range of $120 to $200 per hour to a range of $100 to $150 per hour. The district court, focusing only on Charleston, West Virginia, as the relevant community, drew upon the magistrate judge's own knowledge of the prevailing rates there. The court concluded that both law firms charged excessive rates and "made no distinction between in-court and out-of-court time."
 
 
 38
 Rum Creek Coal contends that the hourly rates it paid to its attorneys were the normal, standard rates charged by the firms in the communities in which they were practicing--Hunton & Williams in Richmond, Virginia, and Smith, Heenan & Althen in Charleston, West Virginia--and that the hourly rates for which it seeks reimbursement are those actually paid by the firms' clients. Even though the litigation was conducted in Charleston, West Virginia, Rum Creek Coal argues that it was justified in retaining Hunton & Williams from Richmond because (1) Hunton & Williams was its regular outside counsel, (2) the case was expected to be difficult and protracted, (3) the case would ultimately end up before the Fourth Circuit in Richmond, where Hunton & Williams is based; and (4) it was suing the sitting governor and the state police superintendent, which would make it and its counsel unpopular in much of West Virginia. Rum Creek Coal contends that the fees it paid Hunton & Williams are reasonable in Richmond and that there is no other evidence in the record to the contrary. With respect to the rate charged by the Charleston attorneys, Rum Creek Coal contends that the magistrate judge's knowledge of the prevailing market rate was flawed because most of the cases to which the magistrate judge referred involved other types of matters, such as bankruptcy.
 
 
 39
 Turning first to the rates charged Rum Creek Coal by Hunton & Williams, we agree that the magistrate judge had no factual basis to reduce the rate to a range of $80 to $160 per hour, as he did. The only facts in the record reveal that the rates charged by Hunton & Williams, predominantly in the range of $115 to $230 per hour, were their normal Richmond hourly rates, that the rates were charged to and actually paid by Rum Creek Coal, and that the persons involved in charging and paying those rates believed them to be reasonable. Such evidence is sufficient to establish the "prevailing market rate" for services charged by Hunton & Williams to its clients in Richmond. See Gusman, 986 F.2d at 1150.
 
 
 40
 That those rates are based on Richmond market data does not, in the circumstances of this case, make the evidence irrelevant. In National Wildlife Federation v. Hanson, 859 F.2d 313 (4th Cir.1988), we observed that the community in which the court sits is the first place to look to in evaluating the prevailing market rate. Rates charged by attorneys in other cities, however, may be considered when "the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally," and the party choosing the attorney from elsewhere acted reasonably in making the choice. Id. at 317.
 
 
 41
 In this case both criteria are fulfilled. The litigated issues included questions of preemption and constitutional law and their complexity is demonstrated by the fact that both appeals to this court resulted in reversals of the district court. In addition Hunton & Williams is Rum Creek Coal's regular counsel located in Richmond, and its lawyers are concededly well-experienced in the type of matters involved. Rum Creek Coal makes a persuasive argument that it was necessary to use outside counsel since taking on the governor and the police of the state where the trial court is located, in the middle of a well-publicized coal miners' strike, could be a politically sensitive activity for a local West Virginia firm. Moreover, it is to be noted that a substantial portion of the fees charged by Hunton & Williams were for services rendered in Richmond in connection with the appeals to this court. With respect to these activities, the Hanson criteria need not even be considered.
 
 
 42
 Accordingly, because the adjustments to Hunton & Williams' hourly rates lacked any factual basis, we reverse that ruling of the district court.
 
 
 43
 With respect to the rates of the Charleston lawyers, the outcome is different because of the additional knowledge contributed to the decision by the magistrate judge. While Rum Creek Coal makes a persuasive argument that the fees actually charged by its law firm in Charleston, predominantly in the range of $120 to $200 per hour, and paid by clients there should be strong evidence of the prevailing market rate, we cannot say that a contrary factual finding by the magistrate judge constitutes an abuse of discretion where the magistrate judge used his own personal knowledge of the prevailing rates in Charleston. The magistrate judge reduced the rate allowed to Rum Creek Coal's Charleston lawyers to the range of $100 to $150 per hour. Because of this evidentiary basis for his ruling, under our deferential standard of review, we affirm the ruling insofar as it adjusts the rates of the Charleston, West Virginia, lawyers.
 
 30%-Reduction Across the Board
 
 44
 The district court approved the specific reductions identified and recommended by the magistrate judge and imposed yet a further 30% reduction of the original fee application because of the "excessive nature and unreasonable redundancy of plaintiff's work." When reviewing the number of hours for excessiveness or reasonableness, the court properly turned to the Johnson factors. See Daly, 790 F.2d at 1075 n. 2. The district court observed that the plaintiff's work was "clearly novel ... [b]ut [it concluded that] attacking the constitutionality of any statute is not difficult." Moreover, it was concerned about the generalized nature of many billing entries that listed simply "telephone call to Smith," "letter to client," or "legal research." It was also concerned about the lumping of billing entries and duplication of effort. The court acknowledged that all counsel were "highly competent and well-experienced in labor litigation," but concluded that counsels' expectation to recover its regular rates "must be clouded by everyone's general knowledge of usual contingent fee contracts" and "usual jury verdicts." The court noted that under a contingent fee arrangement, the plaintiff would have had to obtain a verdict of $2.1 to $2.4 million in order to recover the fees it seeks. Because such verdicts are "infrequent" in the Southern District of West Virginia, the court was reluctant to grant such a large fee award here. Also influencing the court was an earlier-expressed concern that the plaintiff had financial means and any fees awarded would be borne by the taxpayers. It said, in ruling on and deferring consideration of an earlier petition for fees in this case:
 
 
 45
 The claims for fees and expenses represent a large sum of money which, if sustained, would ultimately be borne by the taxpayers of this State. That, in itself, requires that the claims be fully supported by clear and convincing proof.... Petitioners, although given the opportunity, have failed to do so.
 
 
 46
 We share the district court's concern about some of the details of Rum Creek Coal's fee petition, particularly those stating simply "research" or "letter to client." We have frequently exhorted counsel to describe specifically the tasks performed, a practice which is especially necessary when we review an award in a case where the plaintiff has not prevailed on all the claims. See Daly v. Hill, 790 F.2d 1071 (4th Cir.1986). Moreover, we have also been sensitive to the need to avoid use of multiple counsel for tasks where such use is not justified by the contributions of each attorney. See Spell v. McDaniel, 852 F.2d 762 (4th Cir.1988). Generalized billing by multiple attorneys on a large case often produces unacceptable duplication.
 
 
 47
 These deficiencies, however, do not detract from the difficulty and complexity of this case or the hours necessary to prosecute it. As Rum Creek Coal observed in its brief, the litigation was vigorously contested by the State of West Virginia at every step, and in view of the district court's rulings, Rum Creek Coal was required to appeal twice to this court, each time succeeding in its effort. As a result, Rum Creek Coal contends that it has "substantially changed law enforcement policies in West Virginia." We can find no evidence that Rum Creek Coal's attorneys heightened the conflict or in any sense applied an unreasonable effort to the task.
 
 
 48
 While the district court recognized the novelty of the legal theories and the competency of counsel, both of which tend to justify full compensation, it did not address significant Johnson factors such as "the amount involved," "the results obtained" and the "undesirability of the case," all of which tend to weigh in favor of full compensation. No one has argued to minimize the extensive damage caused to Rum Creek Coal or to lessen the importance of this case to its future in West Virginia. Moreover, all parties agree that Rum Creek Coal obtained all of the results which it sought. The theories of recovery were complex and not obvious, involving NLRA preemption, abstention, equal protection, and due process, all directed at long-standing state policies favoring labor unions. Nothing would have suggested at the outset that such a case, particularly one directed at the governor and the state police in a state where Rum Creek Coal needs to do business, is particularly "desirable," at least for lawyers in West Virginia.
 
 
 49
 Although one of the Johnson factors is whether the fee is fixed or contingent, we reject the district court's contingent fee analysis that reasoned that because verdicts of $2.1 to $2.4 million are infrequent, the award here should somehow be reduced. The court never made an analysis of the value of any award in this case to Rum Creek Coal, despite the fact that Rum Creek Coal has contended that the state policy has resulted in millions of dollars in damages to the company.
 
 
 50
 Finally, to the extent that the district court may have considered the fact that taxpayers would be required ultimately to pay the fees, it employed an improper ground for denying or reducing an attorney's fee to the prevailing party under 42 U.S.C. Sec. 1988.
 
 
 51
 In short, we conclude that, by considering improper factors and failing to take into account other applicable Johnson factors, the district court erred. And, to the extent that it failed to recognize the difficulty of the issues, the significance of plaintiff's efforts, and the results obtained, the court abused its discretion in imposing a 30% across-the-board reduction of the fee request. Accordingly, we reverse that ruling.
 
 
 52
 We now turn to the appropriate disposition of this appeal.
 
 IV
 
 53
 This case is before us for the third time. Having been commenced in November 1989, it has proceeded too long and its continuation, with the attendant burden of expense, will in and of itself implicate the ability to work justice. A request for attorney's fees should not result in "a second major litigation." See Hensley, 461 U.S. at 437 & n. 12, 103 S.Ct. at 1941 & n. 12. To avoid further litigation expenses that would follow a remand and the risk of yet a fourth appeal, we would be inclined to award a final fee amount on appeal. See Sidag Aktiengesellschaft v. Smoked Foods Products Co., 960 F.2d 564, 566 (5th Cir.1992) (awarding fees at the appellate level because "as this case is now before us for the fourth time, no useful purpose would be served by further delaying its final disposition"). The record, however, does not permit us to do so. While data is included in the record to support the petition for fees and expenses through January 1993, nothing is included for the period thereafter. It will therefore be necessary to remand the case for a determination of the reasonable fees and expenses incurred after January 1993.
 
 
 54
 Accordingly, for the period through January 1993, we calculate an award in favor of Rum Creek Coal for its attorney's fees and expenses as follows. Beginning with Rum Creek Coal's petition that was the subject of the district court's decision, in the total amount of $802,388.85, we disallow:
 
 
 55
 (a) $11,008.75 for media and public relations;
 
 
 56
 (b) $33,839.54 in intervention-related fees;
 
 
 57
 (c) $15,811.25 for other miscellaneous fees and expenses in connection with an amicus brief, unrelated work, and amounts billed for "general assistants"; and
 
 
 58
 (d) $32,495, representing the reduction made by the magistrate judge in the hourly rate for the Charleston attorneys.
 
 
 59
 Calculating the total, we approve, as an award for fees and expenses for the period that ended January 31, 1993, the amount of $709,234.31. To that sum the district court is directed to add an additional amount for reasonable fees and expenses for the period following January 31, 1993.
 
 
 60
 For the reasons given, we affirm the district court in part, we reverse it in part, and remand this case for further proceedings consistent with this opinion.
 
 
 61
 IT IS SO ORDERED.
 
 WIDENER, Circuit Judge, concurring:
 
 62
 I concur in the result.
 
 
 63
 I also concur in all of the opinion, with only small exception.
 
 
 64
 Rum Creek Coal Sales, Inc. is an affiliate of A. T. Massey, a Richmond, Virginia company. See Coal, June, 1992, p. 38; Coal Week, August 17, 1992, p. 2. I think this Massey affiliate had a right to employ Hunton and Williams, its regular outside attorneys, at Richmond rates, and that so far as an allowance for Hunton and Williams is concerned, Richmond is the relevant market for determining the prevailing rate.
 
 
 65
 I am also of opinion that this litigation was desirable, both for the West Virginia and the Virginia attorneys. That Rum Creek is solvent is shown, if by nothing else, by the fact that it has paid the better part of a million dollars in attorneys' fees. That Rum Creek was in serious difficulty cannot be doubted. Even if some attorneys might be deterred from engaging in such litigation because of the fact that the State and the Union were on the opposite side in the political climate existing, that does not mean the ordinary attorney would be so deterred, I think. I suggest this is a classic case of a solvent client in bad trouble.
 
 
 66
 Other than the small exception in reasoning, I emphasize that I concur in the entire opinion, as well as in the result.
 
 
 67
 MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 68
 Although I readily concur in the balance of the majority opinion, in my view Independent Federation of Flight Attendants v. Zipes, 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989), did not decide whether or not a prevailing plaintiff could, under certain circumstances, recover intervention-related fees from the defendant. Since it seems that there is good reason leading to a fairer result to place the burden on the defendant and not on the victorious plaintiff in a successful civil rights action, I share the view expressed by the Eighth Circuit in Jenkins v. Missouri, 967 F.2d 1248 (8th Cir.1992), decided well after Zipes.
 
 
 69
 As the majority suggests in its opinion, at the very least, the Zipes court "may have left room to argue that intervention-related fees may be shifted under a fee-shifting statute to the defendants...." In parsing dictum from the majority opinion in Zipes and language from the concurrence and dissent, the majority attempts to make the case that Zipes, though not so holding, does in effect prohibit a fee recovery against the defendant by the prevailing plaintiff for services involving an intervenor. Zipes, however, need not be read so broadly. First, as the majority recognizes, Justice Blackmun pointed out in his concurrence in Zipes that he "s[aw] nothing in the language of the statute or in our precedents to foreclose a prevailing plaintiff from turning to the Title VII defendant for reimbursement of all the cost of obtaining a remedy, including the costs of assuring that the third-party interests are dealt with fairly." Zipes, 491 U.S. at 767, 109 S.Ct. at 2740 (Blackmun, J., concurring). While Justice Blackmun's language might be read implicitly to intend "until now," the Zipes majority, having failed to reach the question explicitly, left the question open.
 
 
 70
 Second, the Eighth Circuit, in coming out in Jenkins the other way three years after the Zipes case came down, appears to have rejected exactly the position advanced by the majority's opinion here. See Jenkins, 967 F.2d at 1251 & n. 3 (explaining that the Jenkins defendant advanced the argument that both "dictum" from Zipes and passages from the concurrence and the dissent imply that all intervention-related fees are prohibited). While an Eighth Circuit precedent is not binding on our court, it can be persuasive and here I am convinced by the Eighth Circuit's rationale. In holding that a prevailing plaintiff could collect intervention-related fees from the vanquished defendant, the Jenkins court observed that "this [the Zipes ] dictum must be read in conjunction with the equitable balancing" discussed in Zipes, namely 1) that litigation would result in a great enough fee award without the intervention-related fees to allow the plaintiff to vindicate its rights and, 2) that the "losing intervenors ... have not been found to have violated anyone's civil rights." Jenkins, 967 F.2d at 1251 (internal quotations omitted).
 
 
 71
 Because of the peculiar identity of the corporate plaintiff in the instant civil rights case, the first equitable balancing identified by the Jenkins court simply does not here obtain. Clearly, Rum Creek Coal could no doubt have pursued the litigation with or without an award of intervention-related fees. However, I, despite that consideration, remain concerned that future plaintiffs in the Fourth Circuit, standing in the shoes of the Jenkins plaintiffs, could be dissuaded unfairly from bringing their action against unconstitutional actors.
 
 
 72
 The second equitable factor mentioned in Jenkins, moreover, should not here cause disallowance of a fee award for services against an intervenor. In Zipes, the intervening union's interest was dramatically different from the defendant's in the present case. In Zipes, the intervenor
 
 
 73
 became a party to the lawsuit not because it bore any responsibility for the practice alleged to have violated Title VII, but because it sought to protect the bargained-for seniority rights of its employees. Awarding attorney's fees against such an intervenor would further neither the general policy that wrongdoers make whole those whom they have injured nor Title VII's aim of deterring employers from engaging in discriminatory practices.
 
 
 74
 Zipes, 491 U.S. at 762, 109 S.Ct. at 2737. Here, by contrast, the interests of the AFL-CIO and West Virginia, while distinct enough to bring about intervention, were in reality identical. West Virginia wanted in both cases to restrict its State Police from entanglement in labor disputes, and, no doubt as much or more so, the AFL-CIO wanted such a result.
 
 
 75
 We found the enforcement of those statutes improper, in other words the position advanced by both the State and the AFL-CIO was held unconstitutional. Although as a technical matter, as intervenor, the AFL-CIO was not a "constitutional violator," its interests were virtually the same as those of the defendant, which was a constitutional violator. Under those circumstances it would seem prudent to apply a rule which places the fee burden not exclusively on the prevailing plaintiff, but, for a reasonable share, on the constitutional violator, whose losing position was not only assisted, but indeed largely was created, by the presence of those represented by the intervenor. The contrary rule would create the danger identified by Justice Marshall in the context of the bar on recovery of fees for services for contests with intervenors: "defendants can rely on intervenors to raise many of their defenses, thereby minimizing the fee exposure of defendants and forcing prevailing plaintiffs to litigate many, if not most, of their claims against parties from whom they have no chance of recovering fees." Zipes, 491 U.S. at 779-80, 109 S.Ct. at 2746 (Marshall, J., dissenting).
 
 
 76
 Since Zipes has not foreclosed recovery in the present case from the defendant of an intervention-related fee, the concern raised by Justice Marshall combined with the consideration that the fee-shifting statute intends to place, within certain equitable limits, the burden on the constitutional violator, where thereby an adequate fee is awarded, makes it a better rule, avoiding an inter-circuit conflict, presumptively to allow the recovery from defendants of intervention-related fees, particularly where there is a substantial alignment between the interest of the intervenor and of the defendant. Here the fee for legal services against the intervenor was not met by the award against the defendant, and was not insubstantial. The fee shifted to the defendant was therefore inadequate, and should be increased to cover intervention necessitated activities.
 
 
 77
 Accordingly, I respectfully dissent.